Slip Op. 17- 2

## UNITED STATES COURT OF INTERNATIONAL TRADE

UNITED STEEL AND FASTENERS,
INC.,

      **Plaintiff,**

v.

UNITED STATES,

      **Defendant,**

and

SHAKEPROOF ASSEMBLY
COMPONENTS DIVISION OF ILLINOIS
TOOL WORKS INC.,

      **Defendant-Intervenor.**

Before: Jennifer Choe-Groves, Judge

Court No. 13-00270

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final scope ruling on American Railway Engineering and Maintenance-of-Way Association washers.]

Dated: January 11, 2017

Edward Brian Ackerman and Ned Herman Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, N.Y. and Washington, D.C., argued for plaintiff United Steel and Fasteners, Inc. With them on the brief was Kavita Mohan.

Michael Damien Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Joanna Victoria Theiss, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C.

Raymond Paul Paretzky and David John Levine, McDermott, Will & Emery, LLC, of Washington D.C., argued for defendant-intervenor Shakeproof Assembly Components Division of Illinois Tool Works Inc.

Choe-Groves, Judge:  This is a case of first impression with respect to whether the U.S.

Department of Commerce ("Commerce" or "Department") may retroactively suspend liquidation

after issuing an affirmative scope ruling if liquidation has not been suspended previously.

Plaintiff United Steel and Fasteners, Inc. ("Plaintiff" or "US&F") brings this action contesting

Commerce's final scope ruling on American Railway Engineering and Maintenance-of-Way

Association ("AREMA") washers, which found that AREMA washers are within the scope of

the antidumping duty order covering certain helical spring lock washers from the People's

Republic of China ("China").  See Helical Spring Lock Washers from the People's Republic of

China: Final Scope Ruling on Request from United Steel and Fasteners, Inc., PD 12, bar code

3144783-01 (July 10, 2013) ("Final Scope Ruling"); see also Certain Helical Spring Lock

Washers From the People's Republic of China, 58 Fed. Reg. 53,914 (Dep't Commerce Oct. 19,

1993) (antidumping duty order), as amended, 58 Fed. Reg. 61,859 (Dep't Commerce Nov. 23,

1993) (amended final determination and amended antidumping duty order) ("Order").  This

matter is before the court on Plaintiff's Rule 56.2 motion for judgment on the agency record

challenging Commerce's scope determination and instructions to U.S. Customs and Border

Protection ("Customs" or "CBP") regarding the suspension of liquidation.  See Pl.'s Rule 56.2

Mot. J. Upon Agency R., Dec. 20, 2013, ECF No. 23; Br. Supp. Pl.'s Rule 56.2 Mot. J. Upon

Agency R., Dec. 20, 2013, ECF No. 23 ("US&F Br.").  For the reasons discussed below, the

court concludes that although Commerce's scope determination is supported by substantial

evidence, this case must be remanded because Commerce unlawfully instructed Customs to

suspend liquidation of Plaintiff's entries of AREMA washers retroactively.

# BACKGROUND

On September 8, 1992, Shakeproof Assembly Components Division of Illinois Tool

Works Inc. ("Shakeproof"), a domestic producer of washers and Defendant-Intervenor in this

action, filed a petition for the imposition of antidumping duties on imports of certain helical

spring lock washers from China.  See Certain Helical Spring Lock Washers From the People's

Republic of China: Scope Ruling Request (AREMA Washers) at Attach. 10, PD 1–2, bar codes

3129510-01–02 (Apr. 9, 2013) ("Petition").  After examining the Petition, Commerce initiated an

antidumping duty investigation.  See Certain Helical Spring Lock Washers From the People's

Republic of China and Taiwan, 57 Fed. Reg. 45,765, 45,767 (Dep't Commerce Oct. 5, 1992)

(initiation of antidumping duty investigations).[1]

Commerce and the U.S. International Trade Commission ("ITC") determined that certain

helical spring lock washers from China were sold, or were likely to be sold, in the United States

at less than fair value and the domestic industry was materially injured or threatened with

material injury due to imports of such merchandise.  See Certain Helical Spring Lock Washers

From the People's Republic of China, 58 Fed. Reg. 48,833, 48,833 (Dep't Commerce Sept. 20,

1993) (final determination of sales at less than fair value); Certain Helical Spring Lockwashers

From the People's Republic of China, 58 Fed. Reg. 53,747, 53,747 (Int'l Trade Comm'n Oct. 18,

1993); Certain Helical Spring Lockwashers From the People's Republic of China, USITC Pub.

2684, Inv. No. 731-TA-624 (October 1993) ("ITC Report").  Accordingly, Commerce published

---

[1] Shakeproof petitioned for the imposition of antidumping duties on imports of certain helical
spring lock washers from both China and Taiwan.  See Petition.  Commerce simultaneously
initiated separate antidumping duty investigations for both countries.  This action, however, only
concerns the antidumping duty order resulting from the investigation of imports from China.

an antidumping duty order on certain helical spring lock washers from China on October 19,

1993.[2]  See Order, 58 Fed. Reg. at 53,915.  The scope of the Order provides the following

description of the subject merchandise:

> [C]ertain helical spring lock washers (HSLWs) are circular washers of carbon
> steel, of carbon alloy steel, or of stainless steel, heat-treated or non heat-treated,
> plated or non-plated, with ends that are off-line.  HSLWs are designed to: (1)
> Function as a spring to compensate for developed looseness between the
> component parts of a fastened assembly; (2) distribute the load over a larger area
> for screws or bolts; and (3) provide a hardened bearing surface.  The scope does
> not include internal or external tooth washers, nor does it include spring lock
> washers made of other metals, such as copper.  The lock washers subject to this
> investigation are currently classifiable under subheading 7318.21.0000 of the
> Harmonized Tariff Schedule of the United States (HTSUS).  Although the
> HTSUS subheadings are provided for convenience and customs purposes, our
> written description of the scope of this investigation is dispositive.[3]

Id. at 53,914–15.

Plaintiff imports washers that are designed to meet the standards and specifications of

AREMA, which is the successor industry association to the American Railway Engineering

Association ("AREA").  On April 9, 2013, Plaintiff submitted an application for Commerce to

issue a determination that AREMA washers are not covered by the scope of the Order.  See

---

[2] Commerce later amended its final determination and the antidumping duty order to correct
certain ministerial errors made in the final calculation of the antidumping duty margin.  See
Certain Helical Spring Lock Washers From the People's Republic of China, 58 Fed. Reg. at
61,859.  The amendments did not affect the class or kind of merchandise covered by the scope.

[3] Commerce has since clarified that merchandise subject to the Order is also classifiable under
subheading 7318.21.0030 of the Harmonized Tariff Schedule of the United States.  See Certain
Helical Spring Lock Washers From Taiwan and the People's Republic of China, 76 Fed. Reg.
61,343, 61,343 (Dep't Commerce Oct. 4, 2011) (final results of the expedited third five-year
sunset reviews of the antidumping duty orders); Certain Helical Spring Lock Washers From
Taiwan and the People's Republic of China, 76 Fed. Reg. 75,873, 75,873 (Dep't Commerce Dec.
5, 2011) (continuation of antidumping duty orders).  The scope language remains the same in all
other respects.

Certain Helical Spring Lock Washers From the People's Republic of China: Scope Ruling

Request (AREMA Washers), PD 1–2, bar codes 3129510-01–02 ("Scope Application").

Plaintiff noted in its scope application that it had been importing AREMA washers under

Harmonized Tariff Schedule of the United States ("HTSUS") subheading 7318.21.0090 without

declaring the entries subject to antidumping duties, and that Customs had not assessed

antidumping duties on Plaintiff's entries.  See id. at 5, 5 n.2.

Plaintiff argued in its application that AREMA washers are excluded from the scope of

the Order because: (1) AREMA washers only have modest helicality and are not known as

helical washers in the industry; (2) AREMA washers are usually manufactured to have square or

rectangular cross-sections; (3) the Petition and the ITC Report only reference washers that meet

American Society for Mechanical Engineers ("ASME") standards and specifications; (4) the ITC

Report does not specify that subject helical spring lock washers are for railroad or railway use;

(5) AREMA washers are neither coated nor plated; (6) AREMA washers are between 50–130%

thicker than subject helical spring lock washers; and (7) AREMA washers are subject to a

"permanent set" manufacturing process that flattens the washer surface and minimizes the

helicality of the washer.  See id. at 3–5, 10–14.  Plaintiff also argued that AREMA washers are

distinct from the subject merchandise, as evidenced by the physical characteristics of the

product, the expectations of the ultimate purchasers, ultimate use of the product, channels of

trade in which the product is sold, and the manner in which the product is advertised and

displayed.  See id. at 14–19.

On May 2, 2013, Shakeproof responded by requesting that Commerce issue a final ruling

that AREMA washers are included within the scope of the Order.  See Certain Helical Spring

Lock Washers from China; Response to Application for Scope Ruling, PD 5, bar code 3133528-

01 (May 2, 2013).  Shakeproof argued that Plaintiff's imports were not a different class of

merchandise, but rather a subcategory of subject helical spring lock washers known as track

washers.  See id. at 1, 3–7.  Shakeproof also requested that Commerce instruct Customs to

suspend liquidation and require cash deposits for all entries of AREMA washers retroactive to

the first day of the current administrative review period, October 1, 2012.  Id. at 2, 7–9.

Plaintiff and Shakeproof filed supplemental submissions to support their respective

positions.  See Certain Helical Spring Lock Washers From the People's Republic of China:

Scope Ruling Request (AREMA Washers) Reply to Petitioners 5/2/13 Submission, PD 7, bar

code 3134791-01 (May 9, 2013); Certain Helical Spring Lock Washers from China; Response to

US&F Letter of May 9, PD 8, bar code 3138466-01 (June 3, 2013); US&F Comments on

Petitioner's Supplemental Response in Certain Helical Spring Lock Washers From the People's

Republic of China Scope Inquiry (AREMA Washers), PD 11, bar code 3141411-01 (June 21,

2013).

On July 10, 2013, Commerce issued a final scope ruling determining that AREMA

washers were included within the scope of the Order because the "evidence in the Scope Request

as well as in the Petition, the record of the initial investigation, and the determinations of the

Department and the ITC, demonstrates that the design of AREMA washers facilitates the same

functionality characteristics of helical spring lock washers as described by the scope of the

Order."[4]  Final Scope Ruling at 5–6.  Commerce also determined that retroactive suspension of

---

[4] According to 19 C.F.R. § 351.225(c), within 45 days after receiving an application for a scope

(footnote continued)

liquidation was reasonable because it had not initiated a scope inquiry under 19 C.F.R.

§ 351.225(e) (2013).[5]  See id. at 7–9.  The Department noted that "the language used when

[Commerce] first instructed CBP to suspend liquidation of helical spring lock washers following

the preliminary determination in the investigation clearly demonstrates that US&F's product

should always have been suspended."  Id. at 7–8.  Consequently, Commerce added HTSUS

subheading 7318.21.0090 to the scope of the Order and instructed Customs to collect cash

deposits and suspend liquidation of all unliquidated entries of AREMA washers retroactive to

October 1993, which is the date Commerce first suspended liquidation of subject merchandise

for antidumping purposes.  See id. at 9; see also Certain Helical Spring Lock Washers From the

People's Republic of China, 58 Fed. Reg. 26,112, 26,115 (Dep't Commerce Apr. 30, 1993)

(notice of preliminary determination of sales at less than fair value) (directing Customs to

suspend liquidation); Order, 58 Fed. Reg. at 53,915 (modifying the date entries were first subject

to suspension of liquidation).

        Plaintiff contests Commerce's interpretation of the scope of the Order, as well as

Commerce's instructions to Customs to retroactively suspend liquidation of all unliquidated

---

ruling, Commerce must either issue a final scope ruling pursuant to 19 C.F.R. § 351.225(d) or, if
further inquiry is necessary, initiate a scope inquiry under 19 C.F.R. § 351.225(e).  19 C.F.R.
§ 351.225(c)(2).  Because Plaintiff submitted its scope ruling application on April 9, 2013,
Commerce was required to act on Plaintiff's application by May 24, 2013.  However, on May 9,
2013 Commerce determined that it required additional time to review the application and
responses before deciding whether to issue a final scope ruling or initiate a scope inquiry under
19 C.F.R. § 351.225(e).  See Letter From IA to All Interested Parties Extending Deadline, PD 6,
bar code 3134686-01 (May 9, 2013).  Pursuant to 19 C.F.R. § 351.302(b), Commerce extended
the deadline to act on Plaintiff's application and issued its Final Scope Ruling on July 10, 2013.
See id.

[5] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition.

entries dating back to 1993.  See US&F Br. 12–38.  Plaintiff seeks a remand of the final scope

ruling with instructions for Commerce to determine that AREMA washers are excluded from the

scope of the Order, or alternatively, to initiate a scope inquiry under 19 C.F.R. § 351.225(e) and

withdraw the suspension instructions.  See id.  Defendant argues that Commerce's final scope

ruling is supported by substantial evidence and in accordance with the law.  Def.'s Resp. Pl.'s

Mot. J. Upon Agency R. 7–24, Apr. 10, 2014, ECF No. 31 ("Def. Resp.").  The court held oral

argument on October 25, 2016 on the motion for judgment on the agency record.  See Oral

Argument, Oct. 25, 2016, ECF No. 52.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).  The court will uphold

a determination by Commerce unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(b)(1)(B)(i) (2012);[6] see also NSK Ltd. v. United States, 510 F.3d

1375, 1379 (Fed. Cir. 2007).  "'Substantial evidence . . . means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  A.L. Patterson, Inc. v.

United States, 585 Fed. Appx. 778, 781–82 (Fed. Cir. 2014) (quoting Consol. Edison Co. of N.Y.

v. NLRB, 305 U.S. 197, 229 (1938)).

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title
19 of the U.S. Code, 2012 edition.

## DISCUSSION

### I.    Commerce's Scope Determination

Plaintiff argues that Commerce's scope determination is neither supported by substantial evidence nor in accordance with the law.  Plaintiff submits that its AREMA washers are excluded from the scope of the Order based on analyses of the plain scope language and 19 C.F.R. § 351.225(k)(1) and (k)(2).  See US&F Br. 12–32.  Defendant argues that Commerce reasonably concluded that AREMA washers are within the scope of the Order according to the scope language, the application for a scope ruling, and the descriptions of subject merchandise contained in the (k)(1) sources.  See Def. Resp. 7–18.  Defendant argues further that Commerce determined that the descriptions of the merchandise from the (k)(1) sources are dispositive as to whether AREMA washers are covered by the scope of the Order, and as a result, Commerce properly ended its analysis and did not need to initiate a scope inquiry pursuant to 19 C.F.R. § 351.225(e).  See id. at 18–19.

The scope of an antidumping order may need clarification at times "because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms."  19 C.F.R. § 351.225(a).  To clarify the scope of an order, Commerce's regulations authorize the agency to interpret an antidumping duty order and issue scope rulings that address whether particular products are covered by the scope.  See id.  If an interested party submits an application requesting for Commerce to clarify whether the scope of an order covers particular merchandise, Commerce must either issue a final scope ruling pursuant to 19 C.F.R. 351.225(d) or formally initiate a scope inquiry pursuant to 19 C.F.R. § 351.225(e) within forty-five days after receiving the application for a scope ruling.  19 C.F.R. § 351.225(c)(2).

Commerce may forego an inquiry and issue a final scope ruling if it can determine whether a

product is included or excluded from the scope of an order based solely upon the application for

a scope ruling and the descriptions of subject merchandise contained in the petition, the

underlying investigation, and determinations made by Commerce and the ITC.  See 19 C.F.R.

§ 351.225(d), (k)(1).  Commerce is given significant deference in interpreting and clarifying an

antidumping duty order.  See Ericsson GE Mobile Comm'ns, Inc. v. United States, 60 F.3d 778,

782 (Fed. Cir. 1995) (citing Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir.

1990)), as corrected on reh'g (Sept. 1, 1995).

　　　Here, Commerce issued its final scope ruling pursuant to 19 C.F.R. § 351.225(d).

Commerce determined that the scope language of the Order can be reasonably interpreted to

include AREMA washers because "evidence in the Scope Request as well as in the Petition, the

record of the initial investigation, and the determinations of the Department and the ITC,

demonstrates that the design of AREMA washers facilitates the same functionality

characteristics of helical spring lock washers as described by the scope of the *Order*."  Final

Scope Ruling at 5–6.  As set forth below, Commerce's scope determination was supported by

substantial evidence.

### A.　　　The Plain Language of the Order

　　　In determining whether certain merchandise is included within the scope of an

antidumping duty order, Commerce must first look to the plain language of the order.  See

Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002).  If Commerce

determines that the scope language is unambiguous and clear regarding the merchandise in

question, then it explains what it understands to be the plain meaning of the scope and the

inquiry ends there.  See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 84

(Fed. Cir. 2012).

> The scope of the Order provides the following description of the subject merchandise:

> For purposes of this investigation, certain helical spring lock washers (HSLWs) are circular washers of carbon steel, of carbon alloy steel, or of stainless steel, heat-treated or non heat-treated, plated or non-plated, with ends that are off-line. HSLWs are designed to: (1) Function as a spring to compensate for developed looseness between the component parts of a fastened assembly; (2) distribute the load over a larger area for screws or bolts; and (3) provide a hardened bearing surface.  The scope does not include internal or external tooth washers, nor does it include spring lock washers made of other metals, such as copper.  The lock washers subject to this investigation are currently classifiable under subheading 7318.21.0000 of the Harmonized Tariff Schedule of the United States (HTSUS). Although the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this investigation is dispositive.

Order, 58 Fed. Reg. at 53,914–15.

In its application for a scope ruling, Plaintiff described AREMA washers as "spring

washers utilized **exclusively** for joining continuous lengths of railway rails, as parts of nut and

bolt assemblies that pass through connecting bars to the rails known as joint bars," which "are

made to the specifications of the professional association known as American Railway

Engineering and Maintenance-of-Way Association and it is for this reason that they are known as

'AREMA' washers or AREA washers."  Scope Application at 3 (internal footnote omitted).

Plaintiff explained that AREMA washers "may appear to resemble the helical washers" subject

to the Order, see id. at 4, but identified numerous aspects in which AREMA washers and subject

washers differ to demonstrate that the two are distinct products and that AREMA washers are

outside the scope of the Order.  See id. at 3–5, 10–14.  Commerce could not determine from the

plain language of the Order alone whether AREMA washers were included within the class or

the kind of merchandise that is subject to the Order.  The scope language left it unclear whether

AREMA washers are "helical" and if so, whether AREMA washers are the type of helical spring

lock washers covered by the Order.

### B.     Commerce's Analysis of the Application and the (k)(1) Sources

Because the plain scope language was ambiguous with respect to AREMA washers,

Commerce conducted an interpretive analysis under 19 C.F.R. § 351.225(k)(1), which instructs

Commerce to proceed as follows:

> (k) Other scope determinations. . . . [I]n considering whether a particular product
> is included within the scope of an order or a suspended investigation, [Commerce]
> will take into account the following:
>
>> (1) The descriptions of the merchandise contained in the petition,
>> the initial investigation, and the determinations of [Commerce]
>> (including prior scope determinations) and the Commission.

19 C.F.R. § 351.225(k)(1); see also Duferco, 296 F.3d at 1097 ("[A] predicate for the

interpretive process is language in the order that is subject to interpretation.").  The analysis ends

at this stage if the descriptions of the merchandise from these sources are dispositive.[7]  In this

case, Commerce reasonably found the evidence from Plaintiff's scope ruling application and the

---

[7] If the evidence from the application for a scope ruling and the descriptions of the subject
merchandise from the (k)(1) sources are not dispositive, Commerce turns to the considerations
under (k)(2), which are drawn from the factors set forth in Diversified Prods. Corp. v. United
States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983):

> (2) When the above criteria are not dispositive, [Commerce] will further consider:
>> (i)     The physical characteristics of the product;
>> (ii)    The expectations of the ultimate purchasers;
>> (iii)   The ultimate use of the product;
>> (iv)    The channels of trade in which the product is sold; and
>> (v)     The manner in which the product is advertised and
>>         displayed.

19 C.F.R. § 351.225(k)(2).

descriptions of the subject merchandise contained in the (k)(1) sources to be dispositive on the

issue of whether AREMA washers are subject to the Order.

Commerce considered whether AREMA washers are "helical" spring lock washers

according to the scope of the Order. See Final Scope Ruling at 4–5. The Department examined

the Petition and found that "the designation of 'helical' is both a description of appearance, *i.e.*,

in the form of a helix, and a spring-like attribute or locking function to prevent loosening which

is present when the helix is compressed." Id. at 4 (citing Petition at 5–6). Based on its

understanding, Commerce found that the "pictures provided by US&F clearly show the helical

aspect of AREMA washers." Id. at 5 (citing Scope Application at Attach. 2). The Department

additionally found that other features of AREMA washers (i.e., square or rectangular cross-

sections and permanent set process), which are discussed in further detail below, might have the

effect of diminishing the helicality of the washer, but AREMA washers nevertheless retain their

helicality to a lesser degree. See id. at 4–5. For that reason, Commerce determined that the fact

"the design and function of [Plaintiff's] AREMA washers minimize this 'helical' characteristic,

or that there is no reference to the 'helical' name" does not strip AREMA washers of their helical

function.[8] Id. Moreover, Plaintiff conceded in its application that the characteristics of AREMA

---

[8] Commerce also noted that "AREMA washers are referred to as 'spring washers' throughout US&F's supporting material, which would suggest a similar, not distinct, design/function from subject washers." Final Scope Ruling at 4. Plaintiff asserts Commerce "suggests that because 'US&F does not dispute the fact that AREMA washers are 'spring washers,' AREMA washers are therefore 'helical' spring lock washers." US&F Br. 24. Plaintiff argues that Commerce's conclusion here is unsupported by substantial evidence because not all spring washers are covered by the scope of the Order and, in fact, the ITC stated that the tariff provision covering subject merchandise also includes non-helical spring lock washers. Id. at 25 (citing Certain Helical Spring Lockwashers from Taiwan, USITC Pub. 2651 at I-14, Inv. No. 731-TA-625 (June

(footnoted continued)

washers act in a way that minimalize the helicality of the washer, implying that the washers are helical.  <u>See</u> Scope Application at 4–5.

Commerce addressed whether AREMA washers are the type of helical spring lock washers covered by the Order.  <u>See</u> Final Scope Ruling at 4–5.  The Department identified language in the Petition expressly providing that "[a] significant portion of the larger sizes [of helical spring lock washers] are used for installation of railroad tracks."[9]  <u>Id.</u> at 5 (citing Petition at 3).  As previously stated, AREMA washers are used exclusively for the installation of railroad tracks.  <u>See</u> Scope Application at 3.  Commerce found that "the *Order* covers washers of various steel qualities" and "the *Order* covers coated and non-coated washers," dismissing the notion that AREMA washers are excluded from the Order because they are made of high grade steel and do not have any coating or plating.  Final Scope Ruling at 5.  Commerce concluded that

---

1993)).  However, even accepting Plaintiff's argument does not undermine Commerce's conclusion because Commerce relied on other evidence from the scope application and the (k)(1) sources to conclude that AREMA washers are helical.

[9] The court acknowledges that the language in the final order, not the sources provided for under 19 C.F.R. § 351.225(k)(1), reflects what merchandise is included within and excluded from the scope.  <u>Duferco</u>, 296 F.3d at 1096–97.  However, "the (k)(1) sources are afforded primacy in the scope analysis . . . because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations."  <u>Fedmet Resources Corp. v. United States</u>, 755 F.3d 912, 921 (Fed. Cir. 2014).  The petition is among the sources that Commerce may rely upon in interpreting the scope of an order.  A petitioner is required to describe all imported merchandise from which relief is sought, which dictates the merchandise that Commerce and the ITC investigate in an antidumping duty investigation.  Here, the petition made references to washers that are specifically designed for the installation of railroad tracks.  <u>See</u> Petition at 3.  Commerce was unable to find any information from the Petition, the record of the investigation, or Commerce's and the ITC's prior determinations indicating that such washers are excluded from the merchandise subject to the Order.  Moreover, the final scope of the Order is virtually identical to the merchandise described in the scope of the investigation, which further supports an interpretation that relies in part on the description of subject merchandise as described in the petition.

AREMA washers fall within the parameters of the Order because AREMA washers possess the

physical and functional characteristics described by the scope. <u>See id.</u> at 5–6. Commerce's

conclusion that AREMA washers are covered by the scope of the Order is supported by

substantial evidence.

### C. Plaintiff's Challenges to the Final Scope Ruling

It is Plaintiff's position, however, that AREMA washers are not subject to the Order

because they are neither "helical" nor the type of spring lock washers that are contemplated by

the scope. <u>See</u> US&F Br. 15–28. Plaintiff maintains that the descriptions of subject merchandise

from the (k)(1) sources demonstrate that AREMA washers are excluded from the scope. <u>See id.</u>

at 19–22. Specifically, Plaintiff argues that the (k)(1) sources show that the subject merchandise,

unlike AREMA washers, (1) are made to the specifications of ASME, <u>see id.</u> at 20–21, (2) are

manufactured to have trapezoidal cross-sections, <u>see id.</u> at 19–20, (3) range in thickness from

approximately one-tenth of an inch to three inches for regular, heavy, and extra-duty washers,

<u>see id.</u> at 22, and (4) are not subject to a "permanent set" manufacturing process to flatten the

washer surface. <u>See id.</u> Commerce addressed each of these arguments in its final scope ruling

and reasonably determined that these characteristics do not exclude AREMA washers from the

scope of the Order.

First, Commerce considered whether the scope of the Order only covers merchandise

designed to meet certain industry specifications. <u>See</u> Final Scope Ruling at 4. The washers at

issue are made to the specifications of AREMA and are used exclusively for the installation of

railroad tracks. <u>See</u> Scope Application at 3. Commerce observed that "neither the *Order*, nor

the Petition, nor the record of the initial investigation, nor the determinations of the Department

and the ITC stipulate that helical spring lock washers with [AREMA] certifications are

excluded." Final Scope Ruling at 4.  The Department reasoned that the mere fact the

merchandise in question has been designed and certified by the railroad industry has no bearing

on whether the merchandise is subject to the Order.  The scope language and the (k)(1) sources

thus support Commerce's determination that AREMA certification does not render the

merchandise outside of the scope.[10]

 Second, Commerce assessed whether the Order is limited only to helical spring lock

washers that are manufactured with a trapezoidal cross-section.  See id. at 5.  Commerce found

that "while certain record information suggests that helical spring lock washers generally are

trapezoidal, neither the scope of the *Order* nor any other evidence suggests that helical spring

lock washers always are trapezoidal." Id.  Based on this finding, Commerce reasonably

concluded that the shape of the unfinished wire used to produce the washer does not cause the

merchandise to fall outside of the scope so long as the merchandise retains "the spring or locking

function the helix provides." Id.

 Third, Commerce evaluated whether the Order only encompasses helical spring lock

washers with a thickness-to-diameter ratio of a particular range.  See id.  Commerce found that

the thickness of a washer "is simply a function of a washer's application" and that "helical spring

lock washers generally include light, heavy, extra-duty, and high-collar varieties." Id. (citing

---

[10] Plaintiff argues that Commerce cannot use the absence of exclusionary language in the (k)(1) sources as evidence to support its conclusion that AREMA washers are included within the scope of the Order.  US&F Br. 23 (citing ArcelorMittal, 694 F.3d at 88).  The absence of exclusionary language in the (k)(1) sources is not conclusive, but is evidence that AREMA certification neither causes merchandise to fall within or outside the scope of the Order.

Certain Helical Spring Lockwashers from Taiwan, USITC Pub. 2651 at I-5, Inv. No. 731-TA-

625 (June 1993) ("ITC Taiwan Report") and Petition at 7).[11]  The Department also noted that

"'[a] significant portion of the larger sizes are used for installation of railroad tracks,'" id.

(quoting Petition at 3), which is precisely the application that AREMA washers are designed for.

Commerce found no evidence suggesting that the thickness-to-diameter ratio of AREMA

washers renders the merchandise outside of the scope.  Id.  For these reasons, Commerce

reasonably determined that the Order covers washers with smaller and larger thickness-to-

diameter ratios.

Fourth, Commerce considered whether the Order also includes merchandise that

undergoes a permanent set process during production.  See id.  Commerce found that "this

design/specification is simply based on the function of the washer, whether the customer wants

the washer to lay flat when used."  Id. (citing Helical Spring Lock Washers from China and

Taiwan, USITC Pub. 4276 at I-6, Inv. Nos. 731-TA-624 and -625 (November 2011) and Helical

Spring Lock Washers From China and Taiwan, USITC Pub. 3858 at I-6, Inv. Nos. 731-TA-624

and -625 (June 2006)).  The Department found that the square or rectangular cross-section,

coupled with the permanent set process, ensure that the AREMA washer "will lay flush when

---

[11] In interpreting the scope of an order, Commerce may examine, among other sources, the
descriptions of the merchandise contained in determinations made by the ITC.  See 19 C.F.R.
§ 351.225(k)(1).  As a result, Commerce is allowed to look to the description of the merchandise
contained in the ITC's injury determination from the antidumping duty investigation to
determine whether AREMA washers are included within the scope of the Order.  However,
Commerce in part relied on the ITC's injury determination from the antidumping duty
investigation of helical spring lock washers from Taiwan because the ITC incorporated by
reference the information collected in the Taiwan investigation for its injury determination in the
China investigation.  See ITC Report at II-4.

compressed to a closed position." Id. (citing Scope Application at 4–5).  Commerce reasonably

determined that this production process for AREMA washers affects the intended application of

railroad track installation, but does not change the function of the washer.

Plaintiff's challenge to Commerce's scope determination relies on the argument that

AREMA washers meet AREMA specifications rather than those set by ASME.[12]  Plaintiff's

argument presumes, however, that the subject merchandise only includes washers that meet

ASME standards.  Though the Petition and the ITC Report include references to ASME

standards and specifications in describing helical spring lock washers, see Petition at 7; ITC

Taiwan Report at I-5 n.5, Plaintiff acknowledged at oral argument that the evidence on the

record shows that the Order is not confined to helical spring lock washers conforming to ASME

standards and specifications.  See Oral Argument at 00:03:44–00:04:30.  As explained above,

Commerce reasonably interpreted the Order to cover helical spring lock washers without regard

to which association's specifications the washers are designed to meet, as long as the washers

possess the physical and functional characteristics described in the scope.

---

[12] Plaintiff argues that the scope of the Order only covers merchandise that is designed to meet
ASME specifications and standards, not AREMA.  See US&F Br. 15–16, 20–21.  For support,
Plaintiff notes (1) "[t]he AREMA manual section for washer specifications references 'spring
washers' but does not reference 'helical even a single time . . . [and] the published ASME
standards of the Industrial Fasteners Institute reference the term 'helical' or [helical spring lock
washer] a total of 37 times," id. at 16 (internal citations omitted), (2) Shakeproof submitted
ASME standards as an attachment to the Petition, id. at 16, 20 (citing Petition at App. 7), (3) the
Petition states that "[s]pecific dimensions and descriptions of helical spring lock washers are
provided by the American Society of Mechanical Engineers ('ASME') standards for lock
washers," id. (quoting Petition at 7), (4) washers meeting AREMA standards were not referenced
in the Petition, id., and (5) the ITC injury determination from the antidumping duty investigation
refers to ASME specifications and standards and does not make any reference to AREMA.  Id. at
21 (citing ITC Taiwan Report at I-5 n.5).

Plaintiff also argues that the subject helical spring lock washers are used for general

fastening applications, which does not include an application specific to rails or railways.  See

US&F Br. 21–22.  Yet, the merchandise subject to the Order is used in many applications in a

number of different industries.  As the Petition states,

> [h]elical spring lock washers are primarily sold to original equipment
> manufacturers ("OEMs") that produce a wide variety of articles from automobiles
> to lawn mowers, as well as equipment used by the armed services.  A significant
> portion of the larger sizes are used for installation of railroad tracks.  A small
> percentage of helical spring lock washers are sold to do-it-yourselfers in hardware
> stores.

Petition at 3.  It is reasonable for Commerce to determine that the scope includes merchandise

that is designed and certified for a particular application, such as the installation of railroad

tracks.

Plaintiff argues further that AREMA washers are not included within the scope of the

Order because AREMA washers and the merchandise subject to the Order are two distinct

products according to trade usage and industry practice.  See US&F Br. 15–19, 23–27.  Plaintiff

asserts that "'antidumping orders should not be interpreted in a vacuum devoid of any

consideration of the way the language of the order is used in the relevant industry.'"  Id. at 24

(quoting ArcelorMittal, 694 F.3d at 88).  Commerce considered this claim and apparently could

not conclude that AREMA washers are excluded from the Order according to trade usage and

industry practice in light of the evidence on the record indicating otherwise.  See Final Scope

Ruling at 4–6.

In interpreting scope language, Commerce must follow its regulatory procedures and

support its scope interpretation with "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477

(1951).  As explained above, Commerce conducted an analysis according to its regulations and

reasonably interpreted the Order to include AREMA washers.  The court finds that Commerce's

scope determination is supported by substantial evidence and is in accordance with the law.[13]

## II.    Commerce's Instructions to Suspend Liquidation Retroactively

Plaintiff contends that Commerce unlawfully instructed Customs to suspend liquidation

of unliquidated entries of AREMA washers retroactively, dating back to the issuance of the

Order in 1993.[14]  <u>See</u> US&F Br. 33–38.  In response, Defendant argues that the instructions are

lawful because Commerce did not initiate a formal scope inquiry and determined that AREMA

washers have always been within the scope of the Order.  <u>See</u> Def. Resp. 19–24.  Though the

court affirms Commerce's interpretation of the scope, Commerce's instruction to Customs to

---

[13] Plaintiff argues that an analysis of the (k)(2) criteria supports the exclusion of AREMA washers.  <u>See</u> US&F Br. 29–32.  However, Commerce was able to resolve the scope issue based on Plaintiff's application for a scope ruling and the descriptions of the merchandise contained in the (k)(1) sources.  The court will not opine on the (k)(2) criteria because Commerce was not required to consider the (k)(2) factors in this matter.

[14] Commerce instructed Customs "to suspend liquidation of all unliquidated entries of merchandise made on or after the first day merchandise subject to the *Order* was suspended for antidumping purposes and collect cash deposits on all such entries."  Final Scope Ruling at 9.  The first day merchandise subject to the Order was suspended for antidumping purposes was October 15, 1993.  <u>See</u> <u>Certain Helical Spring Lock Washers From the People's Republic of China</u>, 58 Fed. Reg. at 26,115 (directing Customs to suspend liquidation); Order, 58 Fed. Reg. at 53,915 (modifying the date entries were first subject to suspension of liquidation).  Though Commerce's suspension instructions in the final scope ruling effectively suspended liquidation of AREMA washers retroactive to 1993, the instructions ostensibly only affect unliquidated entries that are protected by the preliminary injunction in this action, which enjoined Commerce from issuing instructions to liquidate and Customs from liquidating unliquidated entries of AREMA washers from China that were entered or withdrawn from the warehouse between October 1, 2011 and September 30, 2013.  <u>See</u> Order, Nov. 15, 2013, ECF No. 22.

retroactively suspend liquidation of AREMA washers is contrary to law because the instruction

exceeds Commerce's regulatory authority.

Subsection (l) of 19 C.F.R. § 351.225 sets forth Commerce's authority to suspend the

liquidation of merchandise subject to a scope proceeding as follows:

(l) Suspension of liquidation.

(1) When the Secretary conducts a scope inquiry under paragraph (b) or
(e) of this section, and the product in question is already subject to suspension of
liquidation, the suspension will be continued, pending a preliminary or a final
scope ruling, at the cash deposit rate that would apply if the product were ruled to
be included within the scope of the order.

(2) If the Secretary issues a preliminary scope ruling under paragraph
(f)(3) of this section to the effect that the product in question is included within
the scope of the order, any suspension of liquidation described in paragraph (l)(1)
of this section will continue.  If liquidation has not been suspended, the Secretary
will instruct the Customs Service to suspend liquidation and to require a cash
deposit of estimated duties, at the applicable rate, for each unliquidated entry of
the product entered, or withdrawn from warehouse, for consumption on or after
the date of initiation of the scope inquiry.  If the Secretary issues a preliminary
scope ruling to the effect that the product in question is not included within the
scope of the order, the Secretary will order any suspension of liquidation on the
product ended, and will instruct the Customs Service to refund any cash deposits
or release any bonds relating to that product.

(3) If the Secretary issues a final scope ruling, under either paragraph (d)
or (f)(4) of this section, to the effect that the product in question is included within
the scope of the order, any suspension of liquidation under paragraph (l)(1) or
(l)(2) of this section will continue.  Where there has been no suspension of
liquidation, the Secretary will instruct the Customs Service to suspend liquidation
and to require a cash deposit of estimated duties, at the applicable rate, for each
unliquidated entry of the product entered, or withdrawn from warehouse, for
consumption on or after the date of initiation of the scope inquiry.  If the
Secretary's final scope ruling is to the effect that the product in question is not
included within the scope of the order, the Secretary will order any suspension of
liquidation on the subject product ended and will instruct the Customs Service to
refund any cash deposits or release and bonds relating to this product.

19 C.F.R. § 351.225(l).  The Department must abide by the regulatory provision governing its

authority to suspend liquidation following affirmative final scope rulings, which instructs

Commerce to suspend liquidation "on or after the date of initiation of the scope inquiry" if

liquidation has not already been suspended.  19 C.F.R. § 351.225(l)(3).

In the matter before this court, Commerce issued an affirmative final scope ruling

pursuant to 19 C.F.R. § 351.225(d) and entries of AREMA washers had not been previously

suspended.  See Final Scope Ruling at 4–7.   The Department explained that "a formal scope

inquiry [pursuant to 19 C.F.R. § 351.225(e)] was not initiated and so the regulations are silent

with respect to the date on which the Department should commence suspension of liquidation."

Id. at 7.  Commerce noted that it was "aware of no precedent matching the circumstances of this

scope review" and could not identify an instance where Commerce "has retroactively suspended

liquidation of entries not previously suspended pursuant to a final affirmative scope ruling

without having initiated a formal scope inquiry and with no on-going administrative review(s) of

the antidumping or countervailing duty order at issue."  Id.  Notwithstanding this lack of

administrative precedent, the Department found that "19 CFR [§] 351.225(l)(3) does not

preclude suspension of liquidation on a date prior to 'on or after the date of initiation of a scope

inquiry.'"  Id.  Based on this ambiguity in the regulation, Commerce reasoned that it could order

Customs to suspend liquidation of entries of AREMA washers retroactively.  See id. at 9.

The court will sustain Commerce's determinations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  An agency's interpretation of its own regulations is given "'controlling

weight unless it is plainly erroneous or inconsistent with the regulation,'" based on indications of

intent at the time of the regulation's promulgation.  Thomas Jefferson Univ. v. Shalala, 512 U.S.

504, 512 (1994) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945), and

Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)); see also Torrington Co. v. United States, 156

F.3d 1361, 1363–64 (Fed. Cir. 1998)).  According to the regulatory history and prior case law,

Commerce's suspension instructions exceeded the agency's authority.

### A.  Regulatory History of 19 C.F.R. § 351.225(l)

The relevant regulatory provisions are ambiguous regarding the date that the Department

must commence suspension of liquidation when (1) Commerce has issued a final affirmative

scope ruling without having initiated a formal scope inquiry and (2) liquidation has not been

suspended.  In light of this ambiguity, the regulatory history provides relevant insight into

Commerce's intent in drafting the regulations governing the suspension of liquidation in scope

proceedings.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,327–30

(Dep't Commerce May 19, 1997) (final rule) ("Final Rule").  Commerce received numerous

comments when promulgating its regulations, including comments proposing that an order

suspending liquidation should apply to all unliquidated entries in scope proceedings because,

unlike in the context of circumvention,[15] "the Department must view any merchandise that it

determines to be within the scope of an order as always having been within the scope" since

"scope rulings only clarify, and do not expand, the scope of an order."  Id. at 27,327–28.  After

considering this comment, Commerce refused to codify the retroactive suspension of liquidation

in scope proceedings if liquidation has not yet been suspended.  Commerce was mindful when

---

[15] In addition to having the authority to issue scope rulings to clarify whether certain merchandise falls within a pre-defined scope, Commerce may make circumvention determinations pursuant to 19 U.S.C. § 1677j and 19 C.F.R. § 351.225(g)–(j) to lawfully expand an order to cover merchandise that otherwise would not be covered by the scope.  See H.R. Rep. No. 100–576, at 599–601 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1632–34.

drafting its regulations that "[s]uspension of liquidation is an action with a potentially significant

impact on the business of U.S. importers and foreign exporters and producers." Id. at 27,328.

The Department explained that, "when liquidation has not been suspended, Customs, at least,

and perhaps the Department as well, have viewed the merchandise as not being within the scope

of an order, importers are justified in relying upon that view, at least until the Department rules

otherwise." Id.

Commerce also recognized that the domestic industry had concerns about potential

financial harm resulting from imports escaping the assessment of duties prior to the initiation of

a scope inquiry pursuant to 19 C.F.R. § 351.225(e). See id. To strike a balance between the

competing interests of all parties, Commerce decided in its regulations (1) "to impose a time

limit of 45 days, from the receipt of a request for a scope ruling, on the determination whether to

initiate a formal scope inquiry under § 351.225," and (2) "to make a suspension of liquidation,

when ordered in conjunction with a preliminary or final affirmative ruling, effective as to entries

of all affected merchandise that are made on or after the date of initiation of the scope inquiry

and that remain unliquidated as of the date of publication of the affirmative ruling." Id.

Commerce did not indicate that the regulation conferred broader authority to suspend liquidation

retroactively where Commerce does not initiate a scope inquiry and issues a final scope ruling

pursuant to 19 C.F.R. § 351.225(d). Commerce instead substantially limited the temporal reach

of an affirmative scope ruling by promulgating these limitations on the suspension of liquidation

in its regulations. Thus, the regulatory history highlights the fact that Commerce did not intend

to apply an order suspending liquidation retroactively in a scope proceeding at the time the

governing regulations were promulgated.

### B.  Relevant Authority

Previous decisions issued by this court and the Court of Appeals for the Federal Circuit

are also instructive in understanding the limitations on Commerce's authority to suspend

liquidation retroactively in a scope proceeding.  See AMS Assocs., Inc. v. United States, 36 CIT

__, 881 F. Supp. 2d 1374 (2012) ("AMS Assocs. I"), aff'd, 737 F.3d 1338 (Fed. Cir. 2013)

("AMS Assocs. II").

In AMS Assocs. I, at issue were Commerce's suspension instructions during the second

administrative review of the antidumping duty order on laminated woven sacks from China.

During the first review, Commerce undertook an investigation into whether laminated woven

sacks produced using fabric from third countries were of Chinese origin and subject to the

antidumping duty order.  See AMS Assocs. I, 36 CIT at __, 881 F. Supp. 2d at 1376.  Commerce

found that China was the country of origin and subsequently issued a "clarification" instructing

Customs to suspend liquidation of the subject merchandise from China.  Id. at __, 881 F. Supp.

2d at 1376–77.  The court explained that "the effect of the Clarification was to retroactively

suspend liquidation of and collect cash deposits of antidumping duties on all entries of [the

respondent's] sacks made with non-PRC origin fabric after January 31, 2008."  Id. at __, 881 F.

Supp. 2d at 1377.  In the second administrative review, Commerce followed its prior country of

origin determination and issued retroactive suspension instructions.  See id.  The plaintiff filed

suit arguing that Commerce acted contrary to its regulations by ruling on the scope of the order

during the administrative review without initiating a scope or circumvention inquiry as provided

for under 19 C.F.R. § 351.225.  See id. at __, 881 F. Supp. 2d at 1378.  The court agreed.

The court explained that the Department "must abide by the restrictions imposed on its authority to perform certain actions during a scope inquiry regardless of the formality of the proceeding pursuant to which that is determined." Id. at __, 881 F. Supp. 2d at 1380. The court noted that "[e]ven if Commerce decided not to initiate a formal scope proceeding, it was bound by the substantive regulations regarding suspension of liquidation during scope determinations." Id. at __, 881 F. Supp. 2d at 1381. The court dismissed the notion that retroactive suspension instructions are appropriate where merchandise falls within the original scope because such an "argument[] could be applied in any scope inquiry, because by definition Commerce decides in those proceedings whether the product involved falls within the previously-defined scope." Id. at __, 881 F. Supp. 2d at 1382. The court also expressed concerns with affirming Commerce's actions because "Commerce could avoid the restriction on suspension of liquidation in any case by simply declaring an 'informal' scope review and issuing retroactive suspension of liquidation instructions to CBP to 'clarify' what the original scope definition covers." Id. Accordingly, the court held that Commerce's retroactive suspension instructions were based upon an erroneous interpretation of the agency's regulations and exceeded the agency's authority under 19 C.F.R. § 351.225(l). Id. at __, 881 F. Supp. 2d at 1382–83.

The Court of Appeals for the Federal Circuit subsequently affirmed the court's decision in AMS Assocs. I. See AMS Assocs. II, 737 F.3d at 1343. The Court of Appeals explained that, "if Commerce determines that a product that is not subject to the existing order should be included within the scope of that order, then the scope regulations specifically authorizing Commerce to instruct Customs to suspend liquidation and to require cash deposits of estimated duties for such merchandise have limits." Id. The Court of Appeals declared that "when

Commerce 'clarifies' the scope of an existing antidumping duty order that has an unclear scope,

the suspension of liquidation and imposition of antidumping cash deposits may not be

*retroactive* but can only take effect 'on or after the date of the initiation of the scope inquiry.'

The unambiguous plain language of the regulation only authorizes Commerce to act on a

*prospective* basis, and such express prospective authorization reasonably is interpreted to

preclude retroactive authorization." Id. at 1344. Thus, the Court of Appeals held that Commerce

acted contrary to its regulations because the scope of the order was unclear regarding the

merchandise and, in such circumstances, the regulations only authorize Commerce to suspend

liquidation on a prospective basis. See id.

    If the court affirms Commerce's actions here, the AMS Assocs. I court's concerns would

come to fruition and Commerce would be able to "avoid the restriction on suspension of

liquidation in any case by simply declaring an 'informal' scope review and issuing retroactive

suspension of liquidation instructions to CBP to 'clarify' what the original scope definition

covers." AMS Assocs. I, 36 CIT at __, 881 F. Supp. 2d at 1382. Commerce acknowledged the

court's holding in AMS Assocs. I that Commerce exceeded its authority by suspending

liquidation retroactively. Final Scope Ruling at 7. Commerce theorized that the decision in

AMS Assocs. I was based on facts distinguishable from this case. See id. at 7–8. Commerce

asserted that the action reviewed by the court in AMS Assocs. I was made in the context of an

administrative review pursuant to a substantial transformation analysis and involved instructions

suspending liquidation retroactive to the beginning of the first period of review. However,

Commerce found distinctions where no real difference exists. In AMS Assocs. I and AMS

Assocs. II, Commerce ignored its regulatory procedures for interpreting the scope of an

antidumping or countervailing duty order and exceeded its authority to suspend liquidation.

Here, the Department similarly failed to abide by the regulatory constraints on suspending

liquidation.

Defendant emphasizes the Court of Appeals' comment in <u>AMS Assocs. II</u> that

"Commerce does not have to initiate a formal scope proceeding . . . when it wishes to issue a

ruling that does not clarify the scope of an unambiguous original order." Def. Resp. 21 (quoting

<u>AMS Assocs. II</u>, 737 F.3d at 1344).[16] That statement does not lend support, however, to

Defendant's position. Commerce's examination of the (k)(1) sources without a formal scope

inquiry does not relieve the Department of its obligation to comply with its regulations

concerning the effective date for suspending liquidation because the final scope ruling clarified

the scope of an ambiguous order.

Defendant argues that "unlike *AMS*, there was no 'clarification' issued by Commerce . . .

[t]hus, Commerce was not required by 19 C.F.R. § 351.225 to initiate a formal scope inquiry nor

to issue instructions effective on or after the date of the scope inquiry Commerce had properly

declined to undertake." Def. Resp. 21. The court does not agree. A scope ruling by definition is

a determination issued by Commerce that clarifies the scope of a standing antidumping or

---

[16] Commerce may issue a scope ruling by examining the (k)(1) factors pursuant to 19 C.F.R.
§ 351.225(d) or (e), but under (e) it sends a letter to initiate an inquiry, and under (d) it does not
provide such notice. The court cannot identify any material difference between a (k)(1) analysis
performed under either approach. Defendant could not explain a difference during oral
argument. <u>See</u> Oral Argument at 00:34:48–00:40:55. According to Defendant, it seems that
Commerce can arbitrarily decide whether to initiate an inquiry or not, with the ability to "avoid
the restriction on suspension of liquidation in any case by simply declaring an 'informal' scope
review and issuing retroactive suspension of liquidation instructions to CBP to 'clarify' what the
original scope definition covers." <u>AMS Assocs. I</u>, 36 CIT at __, 881 F. Supp. 2d at 1382.

countervailing duty order. 19 C.F.R. § 351.225(a) (providing that scope rulings "clarify the

scope of an order . . . with respect to particular products"). There was a genuine question as to

whether AREMA washers were within the scope of the Order that required Commerce to make a

determination. Customs had not been collecting deposits of antidumping duties on Plaintiff's

entries of AREMA washers, suggesting that the scope of the Order was not clear with respect to

such merchandise. Customs' failure to assess antidumping duties on Plaintiff's entries ostensibly

showed that Customs did not view Plaintiff's merchandise within the scope of the Order.

Commerce needed to issue the final scope ruling to clarify that AREMA washers are included

within the scope of the Order. Thus, Defendant's argument cannot withstand scrutiny.[17]

---

[17] The Court of Appeals in AMS Assocs. II cited Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1378–79 (Fed. Cir. 2003) to illustrate when Commerce does not clarify the scope of an order. See AMS Assocs. II, 737 F.3d at 1344. The Huaiyin case involved a clarification message sent by Commerce to Customs. In the final determination from the antidumping duty investigation on freshwater crawfish tail meat from China, Commerce assigned "Huaiyin Foreign Trade Corporation" a company-specific rate rather than the typically higher country-wide rate that is assigned by default in non-market economy proceedings. See Huaiyin, 322 F.3d at 1372–73. Commerce later learned, however, that many companies bear the name "Huaiyin Foreign Trade Corporation" and only the company named Huaiyin-5 was entitled to a company-specific rate. See Huaiyin, 322 F.3d at 1373. As a result, Commerce sent a clarification message to Customs stating that only Huaiyin-5 was entitled to the company-specific rate. See Huaiyin, 322 F.3d at 1373. Huaiyin-30 contended that the clarification message constituted an unlawful change to the antidumping duty order. The Court of Appeals did not agree because (1) Huaiyin-30 did not participate in the initial investigation and was therefore never entitled to a company-specific rate, and (2) Commerce made no change to the order because it "neither changed the companies entitled to the decreased rate, nor modified the type of products covered by the . . . order." Huaiyin, 322 F.3d at 1379. In Huaiyin the scope was clear and Commerce did not make a clarification regarding the class or kind of merchandise subject to the order. By contrast, in this case Commerce determined that the scope of the Order was unclear and issued a final scope determination to clarify that AREMA washers were included within the scope.

Defendant relies upon the court's decision in <u>Shenyang Yuanda Aluminum Industry</u>

<u>Engineering Co. v. United States</u>, 38 CIT __, 961 F. Supp. 2d 1291 (2014) to support its

argument that the court upheld the retroactive suspension of liquidation.  <u>See</u> Def. Resp. 21–22.

Defendant asserts that in <u>Shenyang</u>, "Commerce did not initiate a scope inquiry and ordered

Customs to 'continue' to suspend liquidation back to the date that entries were first suspended

(plaintiffs' entries had not been subject to suspension of liquidation previously)."  Def. Resp. 22.

Defendant is mistaken.  First, in <u>Shenyang</u>, Commerce instructed Customs to continue to

suspend liquidation, as opposed to suspending liquidation for the first time.  <u>See</u> <u>Shenyang</u>, 38

CIT __, 961 F. Supp. 2d at 1303.  Second, nothing in <u>Shenyang</u> suggests that the plaintiff's

entries had not been suspended previously and that Commerce retroactively suspended

liquidation as Defendant claims.  The <u>Shenyang</u> court explained that "*AMS* is inapplicable to this

case because, here, the instructions added no new products to the scope, and because liquidation

of plaintiffs' curtain wall units has been suspended since publication of the preliminary

determinations."  <u>Id.</u> at __, 961 F. Supp. 2d at 1303.  Defendant's reliance on <u>Shenyang</u> to justify

Commerce's actions is unavailing.

Defendant attempts to justify Commerce's suspension instructions by maintaining that

Plaintiff "was on notice that its entries were potentially subject to antidumping duties."  Final

Scope Ruling at 8.  Defendant's argument is unpersuasive.  The plain language of the scope of

the Order was unclear.  At oral argument, Defendant conceded that, "in some instances the

language of the order can be so abundantly clear and applicable that you don't have to go to

(k)(1), but that isn't the case here."  Oral Argument at 00:27:12–00:27:27.  As stated above,

Customs did not assess antidumping duties on imports of AREMA washers.  Commerce was

compelled to examine the (k)(1) factors and issue a final scope ruling to clarify that AREMA

washers were included within the scope of the Order.  Commerce was required to adhere to its

own policy that "[i]t would be extremely unfair to importers and exporters to subject entries not

already suspended to suspension of liquidation and possible duty assessment with no prior notice

. . . .  Because, when liquidation has not been suspended, Customs, at least, and perhaps the

Department as well, have viewed the merchandise as not being within the scope of an order,

importers are justified in relying upon that view, at least until the Department rules otherwise."

Final Rule, 62 Fed. Reg. at 27,328.  Commerce's determination that Plaintiff's merchandise is

covered by the pre-defined scope does not grant the Department authority to retroactively

suspend liquidation and require cash deposits.  All affirmative scope determinations in effect

state that certain merchandise has always been included within the scope of an order.  See AMS

Assocs. I, 36 CIT at __, 881 F. Supp. 2d at 1382 ("[B]y definition Commerce decides in [scope]

proceedings whether the product involved falls within the previously-defined scope.").

Commerce's regulations provide, however, that such merchandise will not be considered covered

by an order for purposes of duty liability until Commerce issues a preliminary or final scope

ruling, whichever occurs earlier.  See 19 C.F.R. § 351.225(l).  Plaintiff was first put on notice of

what conduct was regulated by the order when Commerce issued its final scope ruling.[18]

---

[18] Defendant also relies on the Court of Appeals for the Federal Circuit's decision in Ugine & ALZ Belg. v. United States, 551 F.3d 1339 (Fed. Cir. 2009), to argue that Commerce acted consistent with its regulations.  See Def. Resp. 20.  Defendant's reliance is misplaced because in that case Commerce issued liquidation instructions pursuant to a negative scope determination. See Ugine & ALZ Belg., 551 F.3d at 1344–46.  The instant case, however, concerns suspension instructions following an affirmative scope determination.

In this case, Commerce decided to suspend liquidation retroactively "[b]ecause the

language used when [Commerce] first instructed CBP to suspend liquidation of helical spring

lock washers following the preliminary determination in the investigation clearly demonstrates

that US&F's product should always have been suspended."  Final Scope Ruling at 8.  The

Department reasoned that:

> the merchandise in question was always included within the scope of the Order
> . . . and the Department's scope determination merely clarifies that fact.  Further,
> once such a finding is made, it would be incongruous not to . . . assess
> antidumping duties on the basis of {this merchandise} for all investigations
> conducted pursuant to the order . . . for remaining unliquidated entries and cash
> deposits for future entries . . . .

Id. at 7.  Commerce recognized that Plaintiff should be able to rely upon Customs' actions at the

time of entry, but noted that such reliance is appropriate only when there is sufficient question to

warrant a formal inquiry.  See id. at 8.  Thus, Commerce instructed Customs "to suspend

liquidation of all unliquidated entries of merchandise made on or after the first day merchandise

subject to the *Order* was suspended for antidumping purposes and collect cash deposits on all

such entries," id. at 9, which effectively instructed Customs to suspend liquidation of all

unliquidated entries retroactive to the issuance of the Order in 1993.  In this case, Plaintiff's

unliquidated entries date back to 2011.

Commerce's suspension instructions are not in accordance with the law in light of the

regulatory language, the regulatory history, and the Court of Appeals' decision in AMS Assocs.

II.  The ambiguous regulatory language did not give Commerce unfettered authority to suspend

liquidation retroactive to the date liquidation was first suspended for antidumping purposes.

Commerce must act within the regulatory constraints on its authority to suspend liquidation, and

any interpretation of its regulations must be consistent with such constraints.  The court

concludes that Commerce exceeded its authority under 19 C.F.R. § 351.225(l)(3) by interpreting

the regulation to authorize retroactive suspension of liquidation when issuing a final scope ruling

pursuant to 19 C.F.R. § 351.225(d) that clarifies the scope of an order.

Commerce's instructions to suspend liquidation retroactively and collect cash deposits on

all unliquidated entries of AREMA washers are not in accordance with the law.  On remand,

Commerce must draft new suspension instructions with a date that is consistent with this

opinion, the regulatory language, the regulatory history, and the Court of Appeals' decision in

AMS Assocs. II.

## CONCLUSION

For the reasons set forth above, the court holds that (1) Commerce's scope determination

is supported by substantial evidence, and (2) Commerce's instructions to Customs to suspend

liquidation of entries of AREMA washers retroactively are contrary to law.  Therefore, in

accordance with the foregoing, it is hereby

**ORDERED** that Commerce's scope determination on AREMA washers is sustained; and

it is further

**ORDERED** that Commerce's instructions to Customs to suspend liquidation of AREMA

washers retroactively are remanded for Commerce to withdraw and draft new suspension

instructions with a date that is consistent with the agency's regulations and this opinion; and it is

further

**ORDERED** that Commerce shall file its new draft suspension instructions by February

6, 2017; and it is further

**ORDERED** that the parties shall file comments on the new suspension instructions by March 6, 2017; and it is further

**ORDERED** that the parties shall file any replies to the comments by March 20, 2017; and it is further

**ORDERED** that Commerce shall issue its new suspension instructions after the court approves.


                                                         /s/  Jennifer Choe-Groves
                                                         Jennifer Choe-Groves, Judge

Dated:   January 11, 2017
              New York, New York